U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2025 JAN 21 PM 4: 13

CLERK

BY _____
DEPUTY CLERK

LINDA L., )
)
Plaintiff, )
)
v. )    Case No. 2:24-cv-00102
)
CAROLYN COLVIN, )
Commissioner of Social Security, )
)
Defendant. )

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE DECISION OF THE COMMISSIONER AND DENYING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 10 & 12)

Plaintiff Linda Langwiser is a claimant for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments under the Social Security Act ("SSA") and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that she is not disabled.[1] (Doc. 10.) The Commissioner moves to affirm. (Doc. 12.) The court took the pending motions under advisement on August 12, 2024.

After Plaintiff's applications for DIB and SSI were denied initially and on reconsideration by the Social Security Administration, Administrative Law Judge ("ALJ") Thomas Merrill found Plaintiff ineligible for benefits because she had not been under a disability within the meaning of the SSA from June 12, 2021, through the date of

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

ALJ Merrill's decision. Plaintiff administratively appealed the decision, and, in doing so, submitted additional medical records that she claimed were new, material, and relevant to the period on or before the date of the hearing decision. The Appeals Council denied review and found that the additional medical evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision.

On appeal, Plaintiff argues that ALJ Merrill erred in (1) finding the opinions of Dr. Jenny Shen, Plaintiff's treating psychiatrist, not persuasive, (2) failing to factor Plaintiff's migraine headaches in her residual functional capacity ("RFC"), and (3) finding Plaintiff was not disabled as of the date of the decision rather than the date of the hearing. Plaintiff also argues that the Appeals Council erred in not finding that the new evidence she submitted showed a reasonable probability that it would have changed the outcome of the ALJ's decision. Plaintiff argues she has met her burden of showing she is disabled and seeks a remand for a calculation of benefits.

Plaintiff is represented by Arthur P. Anderson, Esq. Special Assistant United States Attorneys Jason P. Peck and Vernon Norwood represent the Commissioner.

## I.    Procedural History.

Plaintiff filed her application for DIB on July 7, 2021, and for SSI on June 24, 2021, alleging disability beginning on June 12, 2021, based on, among other things, post-traumatic stress disorder ("PTSD"), anxiety, depression, borderline personality disorder ("BPD"), insomnia, and "panic." (AR 692.) After her claim and request for reconsideration were denied, Plaintiff timely filed a request for a hearing, which was held by video before ALJ Merrill on June 27, 2022. Plaintiff appeared and was represented by non-attorney representative Meriam Hamada. Both Plaintiff and Vocational Expert ("VE") Andrew Vaughn testified.

On November 29, 2022, ALJ Merrill issued an unfavorable decision, which Plaintiff administratively appealed. The Appeals Council denied review on December 5, 2023. As a result, the ALJ's disability determination stands as the Commissioner's final decision.

II.    **ALJ Merrill's November 29, 2022 Decision.**

Plaintiff was twenty-five years old at the onset date of her alleged disability. The ALJ found that Plaintiff has at least a high school education. Her records showed she received individual educational programming ("IEP") for math since the second grade. The ALJ also found she has not engaged in substantial gainful activity since June 12, 2021, although he noted she began receiving unemployment benefits in September 2021, "raising a question as to whether the [Plaintiff] truly was disabled from gainful work during this time or perhaps merely unemployed." (AR 20.) Her past employment includes work as an overnight stocker, cashier, and bakery associate.

In order to receive DIB or SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

At Step One, ALJ Merrill found Plaintiff met the SSA's insured status

3

requirements through June 30, 2025, and that she had not engaged in substantial gainful activity since June 12, 2021, the alleged onset date. At Step Two, he concluded that Plaintiff had the following severe impairments: obesity, BPD, and PTSD. The ALJ acknowledged Plaintiff's testimony that she suffered from frequent headaches but determined this was not a severe impairment because "[t]here is no provider opinion that the alleged headaches are severe or impose any functional limitation." (AR 22.) He noted Plaintiff had been assessed for idiopathic intracranial hypertension[2] ("IIH") but found the condition "not medically determined" because Plaintiff's MRI results were "unremarkable[.]" *Id.* In addition, the ALJ noted that Plaintiff alleged disability in part due to insomnia but concluded the insomnia was "not medically determined" because "[t]here is no provider opinion that the [Plaintiff] has insomnia, nor any opinion attributing functional limitation due to her sleep schedule." *Id.*

At Step Three, ALJ Merrill determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. He concluded Plaintiff's obesity did not meet the severity of a listed impairment but noted her "weight, including the impact on her ability to ambulate as well as her other body systems, has been considered with the limitations of the [Plaintiff's RFC.]" *Id.* at 23.

The ALJ stated he had considered all Listings, including 12.08 and 12.15, and concluded Plaintiff's mental impairments, "singly and in combination," did not meet the "paragraph B" criteria of 12.15. *Id.* at 24 (internal quotation marks omitted). He noted that to satisfy these criteria, the mental impairments must result in "one extreme limitation or two marked limitations in a broad area of functioning." *Id.* Based on Plaintiff's medical records and self-reported activities, which included handling finances, drawing, reading, organizing, using a dating application, and interacting with the public

---

[2] Idiopathic intracranial hypertension, also known as pseudotumor cerebri, is "a disorder most commonly seen in obese young women, characterized clinically by headache, blurred vision, and visual obscurations resulting from increased intracranial hypertension[.]" Stedman's Medical Dictionary 735220.

at a retail job, the ALJ found Plaintiff had "no more than mild limitation" in the area of "understanding, remembering, or applying information" and "no more than moderate limitation" in the areas of interacting with others; maintaining concentration, persistence, or pace; and adapting or managing herself. (AR 24-25.) The ALJ also determined there was "no evidence" that Plaintiff's mental impairments satisfied the "paragraph C" criteria for Listing 12.15, which require "a medically documented history of the existence of the mental disorder in a [L]isting category over a period of at least [two] years[,]" "evidence of medical treatment, mental health therapy, psychosocial supports, or a highly structured setting[] that is ongoing and that diminishes the symptoms and signs of [the] mental disorder[,]" and the record to "demonstrate that the [Plaintiff] has a minimal capacity to adapt to changes in his [or her] environment or to demands that are not already part of his [or her] daily life." *Id.* at 26.

At Step Four, ALJ Merrill determined Plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following non-exertional limitations: She should not climb ladders, ropes, and scaffolds. The [Plaintiff] can understand, remember, and carry out simple tasks and sustain concentration for her [sic] hour periods during an 8-hour workday and 40-hour workweek. She can tolerate occasional social interaction as well as occasional changes in the job. However, she should avoid high production norms.

*Id.*

At the June 27, 2022 hearing, the ALJ asked the VE hypothetical questions regarding the jobs available to a person of Plaintiff's age and education level who should not climb ladders, scaffolds, or ropes; could understand, remember, and carry out simple tasks and sustain them for two-hour periods in an eight-hour workday and forty-hour workweek; could maintain concentration, persistence, and pace for two-hour periods in an eight-hour workday and forty-hour workweek; could tolerate occasional social interaction and changes in job tasks; and should avoid high production norms. The VE opined that Plaintiff would be able to return to past work as a laborer in stores or a bakery associate. When asked what other jobs would be available, the VE identified janitor, mail clerk, and cleaner.

5

Representative Hamada asked the VE what jobs would be available if the ALJ's hypotheticals were limited to "brief, infrequent, and non-intense interactions with supervisors and coworkers[,]" and he responded "I would say no full-time competitive employment." *Id.* at 513-14. The VE further opined that one absence per month and up to fifteen percent off task time would be tolerated in the workplace. When asked by Representative Hamada whether a person with "uncontrollable anger that can be unpredictable, physical aggression, anger outbursts, yelling at somebody[ and] [d]ifficulty controlling their emotions like crying" could maintain competitive employment, the VE answered "no." *Id.* at 516-17.

Considering Plaintiff's age, education, work experience, and RFC, ALJ Merrill determined at Step Five that Plaintiff was able to return to past work as an overnight stocker. He also found that other jobs exist in significant numbers in the national economy which Plaintiff could perform, including janitor (approximately 26,500 jobs nationally), mail clerk (approximately 11,000 jobs nationally), and cleaner (approximately 178,600 jobs nationally). As a result, ALJ Merrill concluded Plaintiff was not disabled.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728

6

F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (first alteration in original). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B.    Whether the ALJ Erred in Finding Dr. Shen's Opinions Not Persuasive.

Dr. Shen submitted a letter on May 4, 2022, describing the "symptoms of [Plaintiff's] diagnoses that would reasonably impair her ability to maintain a job full time[.]" (AR 1857.) The ALJ found this opinion "not persuasive." *Id.* at 31. Plaintiff argues that in finding Dr. Shen's opinions not persuasive, the ALJ ignored an earlier opinion by Dr. Shen that was consistent with her later medical source statement; improperly discounted her medical source statement because it lacked a function-by-function assessment of Plaintiff's abilities; and "improper[ly] substitute[ed] . . . his view of the raw mental health data over the opinions of a qualified psychiatrist[.]" (Doc-1 at 20.) According to Plaintiff, Dr. Shen's "opinions regarding off task time and anti-social behaviors are well supported and consistent with" her treatment notes as well as the opinion of emergency department doctor Steven Runyan and the prior administrative medical findings of state agency reviewers Howard B. Goldberg, Ph.D., and John Petty, Psy.D. (Doc. 10-1 at 16.) The Commissioner counters that substantial evidence supports

7

the weight the ALJ accorded Dr. Shen's opinions.

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of treatment relationship, (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

"[I]t is well-settled that an ALJ may discount an opinion when it is internally inconsistent." *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 398 (W.D.N.Y. 2018); *see also Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (summary order) ("A physician's opinions are given less weight when his opinions are internally

8

inconsistent."); 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). An ALJ may also conclude that inconsistencies with other evidence in the record negatively impacts the persuasiveness of a medical opinion. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

Dr. Shen treated Plaintiff from September 2021 through the disability determination period. In 2021, Plaintiff's therapist at the time, Marilyn Metzger, referred her to the Cognitive Remediation Therapy ("CRT") program at the Howard Center due to lack of progress with her PTSD and BPD symptoms. In a September 21, 2021 evaluation of Plaintiff's eligibility for the CRT program, Dr. Shen opined that "[o]n review of records and per direct interview of [Plaintiff] and mother, [Plaintiff] does appear to meet criteria for a [diagnosis] of [BPD], noted by unstable sense of self, difficulty managing anger, impulsivity and recklessness, self-injurious behaviors and suicidal thoughts, stress-related paranoia and dissociation ('blacking out'), rocky and unstable relationships, [and] chronic feelings of emptiness." (AR 1676-77.) Dr. Shen noted "PTSD [symptoms] that overlap with those of BPD" and that Plaintiff "seems to struggle with [signs and symptoms] of ADHD [attention-deficit/hyperactivity disorder], pending full testing, and possibly [Autism Spectrum Disorder ("ASD")] per her report." *Id.* at 1677. She provided Plaintiff with the name of an organization "to test for ASD or any other learning disability[.]" *Id.* Dr. Shen also noted that Plaintiff "appears to have had several syncopal episodes" as well as memory issues, for which she had been referred to neurological testing and a sleep clinic consult, and that Plaintiff's polycystic ovary syndrome ("PCOS") and "its associated hormonal treatments may also contribute to emotional dysregulation and cognitive issues." *Id.*

Thereafter, Plaintiff enrolled in the CRT program and began treating with Dr. Shen. According to Dr. Shen's treatment notes, Plaintiff tried taking Abilify "for impulsivity/anger outbursts" in October 2021, *id.* at 1657, but stopped the medication due to an adverse reaction. On October 28, 2021, Plaintiff "screened overwhelmingly positive on her [ADHD Self-Report Scale,]" although, according to Dr. Shen, "this is not diagnostic[.]" *Id.* at 1644. Because Plaintiff expressed "she does not want [medication]," Dr. Shen discussed with her "the option of having a support person who acts like a coach in organization, following through, etc." (AR 1644.) Plaintiff was at the time taking hydroxyzine for anxiety, which her primary care provider prescribed. Dr. Shen's March 29, 2022 treatment notes mention that Plaintiff, who was accompanied by her mother, was "not interested in med[ication], which [Dr. Shen] reassured [Plaintiff and her mother] is absolutely okay, and makes sense." *Id.* at 1783.

On May 4, 2022, Dr. Shen authored a "Medical Source Statement of Ability to do Work-related Activities" at the request of Plaintiff's attorney. She reported that since September 2021, she had seen Plaintiff eight times, and listed the following "symptoms of [Plaintiff's] diagnoses that would reasonably impair her ability to maintain a job full time:"

- Uncontrollable anger that may manifest as sudden and unpredictable physical aggression toward others

- Distorted perceptions and paranoia about others

- Verbal and behavioral impulsivity

- Difficulty communicating her needs or thoughts especially when emotional

- Difficulty controlling emotions

- Intense anxiety and panic attacks

- Trouble initiating and completing tasks

- Trouble staying organized or attending to details

- Forgetfulness

- Trouble concentrating on present task or conversation

- Trouble sticking to a preset schedule or keeping track of time

*Id.* at 1857. Dr. Shen explained that she had observed these symptoms either during appointments or through communications with Plaintiff and her case manager in between appointments, noting that Plaintiff "has expressed sudden, oftentimes baffling outbursts of anger or frustration" and that "[h]er intense anxiety has also resulted in her going to the emergency room multiple times in a row." *Id.* "Due to the unpredictable nature of [Plaintiff's] emotional lability," Dr. Shen stated, "it is difficult for me to state how long she could perform the function on a regular and continuing basis consistently over 40-hour work weeks; however, this unpredictability itself signals poor adaptability in a work environment." *Id.* Dr. Shen predicted that Plaintiff's "tendency to terminate relationships, including work relationships, suddenly and completely, plus her multiple trips to the hospital, may all cause severe disruption of a job"; her "cognitive difficulties (e[.]g. concentration, attention to details) may also cause her to make mistakes at a job, which would then lead to emotional outbursts"; and her "hypervigilance and hyperarousal symptoms of her PTSD, plus her underlying [BPD]" would cause her to "cease to function effectively when faced with criticism from supervisors, conflicts with co-workers and peers, and changes in a routine work setting." *Id.* at 1857-58.

Dr. Shen further opined that Plaintiff's "difficulties with concentration, pace, and persistence due to her underlying ADHD as well as emotional lability" would "result in her being off-task at least 20% of an 8[-]hour work day." (AR 1858.) Acknowledging that she did "not have sufficient evidence to form an opinion as to how often [Plaintiff] may be absent from work[,]" Dr. Shen "guess[ed] at least 3-4 days per month, but this would also depend on her job tasks. The more rigid and structured her job tasks are, the more likely her impairments would manifest and result in work absences." *Id.* at 1859.

On June 22, 2021, Plaintiff went to the University of Vermont Medical Center ("UVMMC") emergency department for suicidal ideation. Dr. Runyan, with medical student Andrew DesLauriers, conducted a psychiatric evaluation and determined that Plaintiff did not meet the criteria for inpatient hospitalization or an involuntary hold but would benefit from a hospital diversion program and intensive outpatient treatment. Dr. Runyan noted Plaintiff's BPD diagnosis and, in his mental status examination, described

11

Plaintiff's mood as "anxious and depressed[,]" her affect as "congruent with mood and tearful[,]" and her thought content as "intact and future-oriented, active **suicidal** ideation with no specific plan[.]" *Id.* at 1153 (emphasis in original). He also noted that Plaintiff's father, who was present with her at the emergency department, had become aggressive and hostile toward him and was escorted out by security, after which "[Plaintiff] then aggressively rushed through several people attempting to elope, assaulting a security guard in the process." *Id.* at 1154. Dr. Runyan and another clinician "were able to de-escalate the [Plaintiff] over an extended period of time." *Id.* at 1154-55.

On August 3, 2021, state agency consultant Dr. Petty reviewed Plaintiff's medical records and assessed that she was moderately limited in the abilities to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. He further found she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He likewise found her moderately limited in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.

Dr. Petty opined that Plaintiff could "maintain [concentration, persistence, and pace] involving 1-2 step tasks for 2-hour periods over an 8-hour day/40-hour week"; "engage in brief, infrequent, and non-intense interactions w[ith] supervisors and coworkers"; and "deal w[ith] safety hazards," "travel to unfamiliar places," "use public transportation," "set realistic goals," and "plan independently[,]" although she was "restricted from frequent task changes or high production norms." (AR 527-28.) Dr. Petty also noted that Plaintiff appeared to "overstate[]" the "[m]agnitude of [her] limitations . . . relative to observations of the [Plaintiff] by treating sources/[medical examination report]." *Id.* at 526.

On December 10, 2021, state agency consultant Dr. Goldberg assigned similar

restrictions and assessed that Plaintiff had a mild limitation in understanding, remembering, or applying information and moderate limitations in the areas of interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Dr. Goldberg noted that the "[m]agnitude of limitations w[ith ]mental capacities appears overstated" relative to the medical evidence. *Id.* at 539.

ALJ Merrill found Dr. Shen's May 4, 2022 opinion was "not persuasive" because it "does not contain a detailed, function by function assessment of the [Plaintiff's] mental abilities made in clear vocational terms[,]" "noted on multiple occasions that it would be difficult for her to state what the [Plaintiff's] limitations are[,]" and "does not cite to any specific findings in support of her conclusions." *Id.* at 31-32. The ALJ also criticized Dr. Shen's opinion for failing to "reconcile the relatively marked difficulties in her statement with her own medical records showing that outside of a reported mood the claimant had an otherwise normal mental status." *Id.* at 32. He pointed to her treatment notes describing Plaintiff as presenting with normal mental status during three out of four visits in October 2021; on the fourth visit, Plaintiff reported having a panic attack after taking Abilify, but "presented otherwise calm and cooperative, with back-and-forth conversation on the phone[.]" *Id.* He also noted Plaintiff's March 29, 2022 visit and April 7, 2022 phone call with Dr. Shen, who both times observed "unremarkable mental status," though at the latter encounter Plaintiff's "mood [was] reported as frustrated and her judgment and insight [were] noted to be impaired when she is agitated[.]" (AR 32.)

Without more, a provider's failure to provide a function-by-function assessment of the plaintiff's abilities is not a proper basis for discounting a medical opinion. *See Steven N. v. Berryhill*, 2018 WL 6629681, at *12 (W.D.N.Y. Dec. 19, 2018) (finding ALJ failed to provide "good reasons" for assigning little weight to treating provider's opinion where ALJ had opined that provider's opinion was "a vague statement of disability" and "not a function-by-function statement of the [plaintiff's] ability to perform work") (internal quotation marks and citations omitted); *Doyle v Berryhill*, 2017 WL 2364312, at *6 (D. Vt. May 31, 2017) (noting that "doctor's failure to formulate [his or] her opinion as a function-by-function assessment" is not indicative of opinion's reliability). In this case,

13

however, the ALJ also pointed out that Dr. Shen "noted on multiple occasions that it would be difficult for her to state what the [Plaintiff's] limitations are." (AR 32). Although Dr. Shen stated she could not form a definite opinion as to certain limitations, such as how often Plaintiff would be absent from work, her letter nonetheless assesses work-related limitations, including her opinion that Plaintiff would be "off-task at least 20% of an 8[-]hour work day" and "would respond with anger outbursts, distorted or false accusations of others, and sudden and complete termination of the relationship . . . most of the time when there is criticisms from supervisors, coworkers, and [] complaints from/arguments with the public." *Id.* at 1858-59. Dr. Shen does not, as ALJ Merrill states, fail to cite specific findings for these conclusions. She explains that she "directly observed" Plaintiff's symptoms during their appointments and other communications, was aware of Plaintiff's interactions with her caseworker and others, and her treatment notes document her interactions with Plaintiff in detail. *Id.* at 1857.

Dr. Shen's medical source statement is consistent with the CRT Eligibility Determination Form ("CRT Form") dated September 23, 2021. Signed by Elaine Soto, LICSW, and identifying Dr. Shen as the diagnostician, the CRT form checked "yes" to various criteria, including "[d]isplays maladaptive, dangerous, and impulsive behaviors[,] . . . is self-injurious, expresses suicide threats, or has made suicide attemp[t]s, verbally assaults others, threatens physical violence towards others, or physically harms others[,]" and "[r]equires assistance in basic life and survival skills[,]" and assigned a Global Assessment of Functioning ("GAF") score of fifty out of 100. *Id.* at 1670. As noted by Plaintiff, the ALJ's decision did not mention the CRT Form.

Dr. Shen's medical source statement is also consistent with Dr. Goldberg's and Dr. Petty's opinions, which the ALJ deemed "persuasive" except to the extent that they limited her to one-to-two-step tasks and non-intense interactions, "which are not [] policy compliant terms[,]" *id.* at 32. Although Dr. Goldberg and Dr. Petty noted Plaintiff's tendency to exaggerate the magnitude of her limitations, both nonetheless concluded that Plaintiff was moderately limited in being able to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at

a consistent pace without an unreasonable number and length of rest periods[.]" *Id.* at 527. Courts have found that such a limitation supports a finding of as much as twenty percent off-task time. *See Bruner v. Colvin*, 2017 WL 4215942, at *5 (W.D.N.Y. Sept. 22, 2017) (finding doctor's statement that plaintiff "is moderately limited in her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms" undermined ALJ's determination "that [p]laintiff would not be off task 20% of the time"); *see also Rowling v. Colvin*, 2018 WL 1151106, at *8 (W.D.N.Y. Mar. 5, 2018) (noting that "a moderate impairment . . . would fit in the 20% range"); *D.T. v. Kijakazi*, 2023 WL 6852505, at *8 (N.D. Cal. Oct. 17, 2023) (citing opinion finding moderate limitation in plaintiff's "ability to complete a normal workday and workweek without interruptions" as evidence "that [p]laintiff's impairments would result in at least some time off task") (internal quotation marks and citation omitted). Because Dr. Shen's medical source statement assessed work-related limitations that are well supported and consistent with the record, the ALJ erred by finding her opinion not persuasive for failing to do so. *See Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

ALJ Merrill also gave Dr. Shen's medical source statement less weight because of its inconsistency with Plaintiff's largely normal mental status evaluations at her visits. Courts have cautioned that "it is possible for a [plaintiff] to appear normal at a medical appointment while suffering from serious mental illness." *Debbie L. W. v. Kijakazi*, 2024 WL 1131498, at *12 (D. Vt. Mar. 15, 2024) (internal quotation marks omitted) (quoting *Jorge D. v. Berryhill*, 2020 WL 1482625, at *8 (D. Vt. Mar. 27, 2020)). While Plaintiff presented as calm and cooperative in many of her appointments with Dr. Shen, other evidence in the record documents instances of Plaintiff's "sudden, oftentimes baffling outbursts of anger or frustration that result in her inability to problem solve or communicate productively with others" as described in Dr. Shen's opinion. (AR 1857.)

For example, during her June 22, 2021 hospital visit, Plaintiff "aggressively

15

rushed through several people" and assaulted a security guard, although healthcare workers eventually were able to de-escalate her. *Id.* at 1154. In a treatment note dated February 14, 2022, Ms. Metzger noted that Plaintiff said "she hit her head 10 times yesterday out of frustration[,]" observed Plaintiff's "unhappiness with providers[,]" and wrote that Plaintiff "seems to be struggling and functioning is poor." *Id.* at 1814. An April 6, 2022 note by Dr. Shen described a voicemail left by Plaintiff expressing her frustrations with her case manager as "concerning for polarized thinking[ and] poor distress tolerance[.]" *Id.* at 1775. Dr. Shen's treatment note from the next day described Plaintiff's insight as "impaired when agitated, polarized thinking[,]" judgment as "fair, tends to impulsively request termination of relationships[,]" and thought content as "tend[ing] to perceive ill will from providers/others in otherwise neutral situations[.]" *Id.* at 1772. Considering the longitudinal evidence supporting Dr. Shen's medical source statement, the ALJ erred by discounting her opinion based on Plaintiff's mostly normal mental status examinations. *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order) (noting that normal mental status examinations "analyze the patient's mental state only at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time"); *Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 11 (2d Cir. 2020) (summary order) (noting that plaintiff presenting with "normal" mental status at appointments did not undermine doctor's opinion that he could not concentrate at work).

ALJ Merrill further found that Plaintiff's "daily activities are inconsistent with the extent of her alleged limitations," noting her ability to prepare meals and perform household chores, shop in stores and manage her personal finances, play video games, go out to eat, attend movies, engage with the public, and keep in touch with friends, among other activities. (AR 28.) While Plaintiff's ability to perform daily activities is a proper factor for the ALJ to consider, ALJ Merrill "did not explain how the performance of these limited activities . . . translates into the ability to perform substantial gainful work . . . in a typical competitive workplace environment." *Maskell v. Berryhill*, 2017 WL 2779638, at *8 (D. Vt. June 27, 2017) (alterations in original) (citation and internal quotation marks

16

omitted). Nor did he "address whether Plaintiff was able to perform these same or equivalent tasks for a full workday in a competitive work environment." *Debbie L. W.*, 2024 WL 1131498, at *12. Plaintiff's hearing testimony that "it is very difficult for [her] to keep friends" and that she had verbal altercations with coworkers or supervisors at her previous jobs is consistent with Dr. Shen's opinion that she would be limited in her ability to face criticism from supervisors and co-workers. (AR 505.) It is also consistent with Drs. Petty and Goldberg's opinions that Plaintiff had "moderate" limitations in her ability to interact appropriately with the general public, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Accordingly, Plaintiff's self-reported activities do not provide substantial evidence to support the ALJ's conclusion that Plaintiff's activities conflict with Dr. Shen's opinions. See *Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) ("[W]e disagree with the ALJ that [the plaintiff's] ability to engage in certain activities of daily living—such as caring for her two children, preparing meals and washing dishes, and driving to her medical appointments—provided substantial record evidence to discount [a doctor's] medical opinion.").

The ALJ's conclusions regarding Dr. Shen's opinions are the product of error and not supported by substantial evidence. This error is not harmless because Dr. Shen opined that Plaintiff would be off task for twenty percent of a workday, and the VE testified that only fifteen percent off task time would be tolerated in the workplace. Dr. Shen also opined that Plaintiff would respond with anger outbursts when faced with criticism from supervisors, conflicts with co-workers, or complaints from the public, and the RFC only limited her to occasional social interaction with no limitations specific to any of these distinct groups. *See Janita H. v. Comm'r of Soc. Sec.*, 2023 WL 196158, at *8 (S.D.N.Y. Jan. 17, 2023) (holding that the ALJ erred by imposing limitations related to plaintiff's ability to interact with co-workers but not supervisors or the public because these are distinct groups). The court therefore GRANTS Plaintiff's motion to reverse the decision of the Commissioner.

## C.    Whether the ALJ Erred in Failing to Include Plaintiff's Migraine Headaches in RFC Finding.

Although Plaintiff does not challenge the ALJ's finding that her migraine headaches were not a severe condition, she argues he erred by failing to reflect her headaches in her RFC because "they were supported by a CT scan which showed abnormal findings" and "could contribute to off task time or an inability to focus on job tasks." (Doc. 10-1 at 22). The Commissioner counters that the ALJ correctly concluded, based on the medical evidence, that "there was: 'no provider opinion that the alleged headaches are severe or impose any functional limitation.[']" (Doc. 12 at 15) (quoting AR 22). Plaintiff did not initially identify her headaches as a basis for her DIB application.

"[I]t is well-settled that an ALJ must consider both [p]laintiff's severe and non-severe impairments when assessing the RFC." *Andrew P. v. Comm'r of Soc. Sec.*, 719 F. Supp. 3d 248, 253 (W.D.N.Y. 2024). The plaintiff bears the "burden to prove a more restrictive RFC than the RFC assessed by the ALJ." *Michael P. v. Comm'r of Soc. Sec.*, 2023 WL 21228, at *7 (W.D.N.Y. Jan. 3, 2023); *see Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (noting that plaintiff "had a duty to prove a more restrictive RFC, and failed to do so"). An ALJ does not err by failing to include a condition in the RFC if "there is no evidence of functional limitations caused by the[] impairment[]." *Soler v. Colvin*, 2015 WL 4999907, at *14 (D. Conn. Mar. 3, 2015); *see Willson v. Comm'r of Soc. Sec.*, 2020 WL 5230941, at *5 n.19 (W.D.N.Y. Sept. 2, 2020) (finding harmless any error related to ALJ's failure to mention condition where "there is simply no evidence of functional limitations from the condition").

October 29, 2021, treatment notes from Plaintiff's primary care provider, Dr. Karla Martinez-Dulmer, report that Plaintiff had suffered from headaches for a week "since starting Abilify" and noted "[t]he severity of the problem is mild." (AR 1581.) Dr. Martinez-Dulmer advised Plaintiff that "her headache is secondary most likely to tension headache related to stress, visit to the [emergency department], side effects [of] [A]bilify." *Id.* at 1583. Plaintiff underwent a CT scan on February 1, 2022, at UVMMC,

18

and the reading physician, Benjamin D. Sawatzky, noted the following impressions:

> 1. No evidence of recent intracranial hemorrhage, acute infarction, or mass.
>
> 2. Partially empty sella, which is a nonspecific finding, but can be seen in the setting of [IIH] in the appropriate clinical setting. Further evaluation with MRI of the head is recommended to evaluate for additional associated findings as well as to exclude additional potential etiologies. Confirmation of [IIH] can then be made with lumbar puncture with opening pressures.

*Id.* at 1723. Plaintiff went to the emergency department at UVMMC on April 22, 2022 for a headache and abdominal discomfort. According to treatment notes by Dr. Janusz Porowski, "[t]he symptoms are intermittent and are not accompanied by any neurological deficits" and "there w[ere] absolutely no focal deficits or any concerns for an expanding intracerebral lesion." *Id.* at 1752. Dr. Porowski recommended further evaluation.

On June 6, 2022, Plaintiff saw Dr. Parisa Heidari at UVMMC's Neurology Outpatient Clinic for chronic headaches. According to Dr. Heidari's notes, Plaintiff reported suffering slowly progressively worse headaches and light-headedness since childhood. The notes described the headaches as "sharp, numbness in temples. Pain is once a month. It comes and goes, resting makes it better. Not disabling and [s]he has not taken any medications." *Id.* at 1975. The doctor recommended that Plaintiff see her ophthalmologist and receive an MRI and lumbar puncture.

On June 22, 2022, Plaintiff went to the emergency department at UVMMC for a headache with nausea and dizziness. According to treatment notes by Cady Dubuque, RN, Plaintiff was vomiting but improved upon being given Zofran. She suffered a panic attack and urinated on the hospital bed; after the RN moved her to a clean stretcher, her anxiety improved. The same day, Dr. Katherine A. Walsh performed a lumbar puncture. According to Dr. Walsh's notes, the lumbar puncture was "unsuccessful in obtaining opening pressure, but given slow flow in combination [with] no papilledema seen, IIH seems less likely." *Id.* at 1996.

Plaintiff saw ophthalmologist Dr. Gregory Brophey on June 29, 2022, to be evaluated for IIH. Dr. Brophey found "no optic nerve head edema" but noted that Plaintiff could have IIH without it and stated "[s]he will need a[] [lumbar puncture with]

documentation of the opening pressure, as well as MRI, to help establish the diagnosis." *Id.* at 2004. He also recommended an MRV "to rule out the rare case of cavernous sinus thrombosis[.]" (AR 2004.) On July 6, 2022, Dr. Heidari performed a second lumbar puncture on Plaintiff, but the "[p]rocedure attempt was not successful[.]" *Id.* at 2014. On July 28, 2022, Plaintiff underwent an MRI which revealed a "[p]artially empty sella and mildly prominent fluid around the optic nerves[.]" *Id.* at 2022. The interpreting providers, Michael P. Bazylewicz and Elias Calkins, noted this "can be seen in the setting of [IIH][;] however[,] there is no evidence of optic disc bulging or obvious dural venous sinus stenosis" and recommended a lumbar puncture "for further evaluation." *Id.*

ALJ Merrill acknowledged these medical records but found IIH "not medically determined" and concluded "[t]here is no provider opinion that the alleged headaches are severe or impose any functional limitation." *Id.* at 22. He also acknowledged Plaintiff's testimony that she "get[s] about two really bad headaches" every week, *id.* at 500, but found her self-report inconsistent with evidence that "[o]n October 29, 2021, [Plaintiff] reported mild headaches since starting Abilify one week earlier[,]" and on June 6, 2022, when visiting a different doctor, Plaintiff "now reported" suffering headaches "since early childhood, and that she has had bifrontal sharp headaches with photophobia once a month for ten years[.]" (AR 21.)

"[G]enerally, 'an ALJ is not qualified to assess a [plaintiff's] RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.'" *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. Apr. 13, 2018) (citation omitted); *Cameron H. v. Comm'r of Soc. Sec.*, 2021 WL 4397892, at *5 (W.D.N.Y. Sept. 27, 2021) (remanding where medical records cited by ALJ in support of RFC "contain only raw medical data that does not illuminate how Plaintiff's impairments impact his ability to perform work-related functions"). Most of the medical evidence in the record related to Plaintiff's headaches consists of raw medical data unaccompanied by analysis of whether and how Plaintiff is functionally limited by this condition. ALJ Merrill did not err by declining to rely on these bare medical findings to impose a more restrictive RFC.

Even if the ALJ erred by failing to factor Plaintiff's headaches into her RFC, an error is harmless if it does not affect the ALJ's ultimate determination. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (finding remand unnecessary where "we find no reasonable likelihood that her consideration of the same doctor's 2002 report would have changed the ALJ's determination that [the plaintiff] was not disabled during the closed period"). At best, the objective medical evidence describes Plaintiff as suffering minimal limitations due to her headaches. Dr. Martinez-Dulmer described the severity as "mild[,]" (AR 1581), and Dr. Heidari described the headaches as "not disabling" and occurring once a month. *Id.* at 1975. Plaintiff described more frequent occurrence than once a month in her hearing testimony, but the ALJ found this not credible, based in part on inconsistencies between Plaintiff's prior self-reports to treating physicians. *See Pollino v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 428, 439 (W.D.N.Y. 2019) ("[C]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable.") (internal quotation marks omitted) (quoting *Perez v. Barnhart*, 440 F. Supp. 2d 229, 235 (W.D.N.Y. 2006)). Plaintiff has not shown that the limitations, if any, associated with her headaches would prevent her from performing the jobs the ALJ found she could at Step Five of his disability determination. Any error with respect to the omission of her headaches from the RFC was therefore harmless. *See Russell G. v. Comm'r of Soc. Sec.*, 2021 WL 1085385, at *5 (D. Vt. Mar. 22, 2021) (finding error harmless because "the ALJ identified at least one job existing in the national economy that [p]laintiff could perform").

For the foregoing reasons, ALJ Merrill's failure to address Plaintiff's headaches does not provide an independent ground for reversing the Commissioner's decision. Nonetheless, the ALJ, upon remand, should consider Plaintiff's medical evidence related to her headaches in accordance with his obligation to "determine the plaintiff's RFC based on an analysis of the entire record[.]" *Emily B. v. Comm'r of Soc. Sec.*, 2020 WL

2404762, at *11 (N.D.N.Y. May 12, 2020).[3]

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 10) and DENIES the Commissioner's motion to affirm (Doc. 12). The court REMANDS this case to the Commissioner for reconsideration of Plaintiff's claim for SSI and DIB.[4]

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 21st day of January, 2025.

Christina Reiss, Chief Judge
United States District Court

---

[3] Because the court grants Plaintiff's motion for an order reversing the decision of the Commissioner, it does not address Plaintiff's arguments that the Appeals Council erred in not reversing Plaintiff's claim based upon new evidence or that the ALJ erred by finding that Plaintiff was not disabled as of the date of his decision rather than the date of the hearing. All medical opinion evidence in the record, "includ[ing] evidence from outside the disability period if that evidence relates to the relevant time frame[,]" should be evaluated upon remand. *Heather Ann P. v. Comm'r of Soc. Sec.*, 2022 WL 167539, at *3 (W.D.N.Y. Jan. 18, 2022) (internal quotation marks omitted) (quoting *Dustin M. v. Comm'r of Soc. Sec.*, 2021 WL 3492923, at *2 (W.D.N.Y. Aug. 9, 2021)); *see also Milillo v. Comm'r of Soc. Sec.*, 2019 WL 642649, at *3 (W.D.N.Y. Feb. 15, 2019) (noting that "the [Social Security Administration's] regulations require the ALJ to evaluate *every* medical opinion [he or she] receives") (emphasis in original).

[4] Plaintiff requests the court remand for calculation of benefits, but the court "decline[s] to do so because [Plaintiff] has not shown that [s]he is entitled to benefits based on the record below." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) (citing *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 2000) (holding remand for award of benefits is appropriate only where the record "provide[s] persuasive evidence of total disability that [would render] any further proceedings pointless") (alterations in original)).

22